**UNITED STATES of America**

v.

**Keith BUTTS and Clarence Edwards.**

Crim. A. Nos. 80–320–1, 80–320–2.

United States District Court,
E. D. Pennsylvania.

March 30, 1982.

Joanne A. Epps, Philadelphia, Pa., for plaintiff.

Anna Durbin, Asst. Fed. Defender, Philadelphia, Pa., for Keith Butts.

Richard B. Moore, Philadelphia, Pa., for Clarence Edwards.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

Keith Butts ("Butts") and a co-defendant Clarence Edwards ("Edwards") were convicted of distributing heroin in violation of 21 U.S.C. § 841(a)(1) and conspiring to distribute heroin and methamphetamine in violation of 21 U.S.C. § 846. Butts was also convicted on separate counts of distributing heroin and methamphetamine in violation of 21 U.S.C. § 841(a)(1). Before the court are their motions for new trial, Edwards' motion for arrest of judgment and Butts' motion for acquittal. For the reasons which follow, their motions for new trial will be granted; Edwards' motion for arrest of judgment and Butts' motion for acquittal will be denied.[1]

At oral argument, counsel put forward three grounds for a new trial: failure to sever the trial of Butts and Edwards, failure to suppress identification testimony and failure to strike testimony due to Jencks Act violations.

### A. Severance

Edwards' counsel moved for severance on the ground that Edwards would refuse to incriminate Butts and that his failure to take the stand would be detrimental to his own case. (N.T. 1.95). Butts' counsel moved for severance pre-trial on the ground of irreconcilable, antagonistic defenses (N.T. 1.100) and again at trial when counsel for Edwards sought to elicit from undercover narcotics agent Frank Lee ("Lee") the fact that Butts' brother was the heretofore unmentioned third man present at the drug deals. (N.T. 3.99–3.101).

■ Edwards' decision not to testify was not based on any valid Fifth Amendment ground and counsel has asserted no legally

---

1. Edwards' motion, which is identical in substance to his motion for new trial, alleges no ground for arrest of judgment, see, Fed.R. Crim.P. 34, nor are his allegations substantiated by the record.

Butts' motion for acquittal pursuant to Fed. R.Crim.P. 29 must be denied because viewing the evidence in a light most favorable to the government, see, United States v. Pratt, 429

F.2d 690 (3d Cir. 1970), there was sufficient evidence for the jury to find Butts and Edwards guilty beyond a reasonable doubt. See, United States v. Phifer, 400 F.Supp. 719, 724 (E.D.Pa. 1975) aff'd. mem., 532 F.2d 748 (3d Cir. 1976).

All other grounds cited by defendants in their various motions have been carefully considered and rejected.

cognizable prejudice. The Fifth Amendment privilege against compulsory self-incrimination is personal to the defendant and it does not extend to testimony which might incriminate third parties. *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Whether or not Edwards testified was a strategic decision for him and his attorney to make. He did not testify and no comments were made on his failure to do so.

■ Butts' assertion that defendants' defenses were antagonistic is not itself a sufficient ground for severance. *United States v. Barber*, 442 F.2d 517 (3d Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). Defendant must show that the antagonistic defenses were so prejudicial that the jury unjustly inferred the guilt of both defendants from the conflict itself. *United States v. Mearns*, 443 F.Supp. 1244 (D.Del.1978). So long as the jury can reasonably be expected to compartmentalize the evidence as it relates to each defendant, co-conspirators should be tried jointly even though the evidence against one is more damaging than against the other. *United States v. Jackson*, 649 F.2d 967 (3d Cir. 1981) (citing *United States v. DeLarosa*, 450 F.2d 1057 (3d Cir. 1971)).

Counsel for Butts has characterized Edwards' defense as one which admitted his presence at the drug deal but denied that he committed an offense. Edwards contended that Butts was the principal actor. Butts' defense was that he was not present. On cross-examination of Lee, Edwards' counsel elicited the name of Ray Butts, the brother of defendant Butts (N.T. 3.101–3.106); this was not improper. In light of Lee's independent identification of defendant Keith Butts, we do not believe Keith Butts' case was prejudiced by the vigorous advocacy of Edwards' counsel. The court instructed the jury to consider each defendant's case separately. (N.T. 5.29).[2] As Butts makes no showing that the jury was unable to "compartmentalize," prejudice from the fact of a joint trial has not been established. *See, United States v. Reicherter*, 647 F.2d 397 (3d Cir. 1981). The court's refusal to sever is not an adequate ground for grant of a new trial.

### B. *Identification Evidence*

Prior to trial, defendants, contending that Lee's identification of defendants was tainted by his suggestive use of police file photographs, moved to suppress. This motion was denied (N.T. 1.93) and the issue is again raised by post-trial motion.

At the suppression hearing, Lee testified that after the illicit drug deals were completed, he used the police department photograph file which is indexed by name. Lee had learned Butts' name from a prior investigation (N.T. 1.34–1.35); Edwards' picture was among those indexed under "Keith Butts." (N.T. 1.33). Lee testified that other officers working in the area had suggested a person named Edwards as one allegedly involved in narcotics activities. (N.T. 1.50–1.53). Photographs of persons named "Edwards" were also ordered. (N.T. 1.52). The photograph of each defendant obtained in this manner was given to defense counsel (N.T. 1.57); but all the other photographs from which defendants' photographs were selected had been either returned to the file or destroyed. These other photographs were not available to defense counsel prior to or at trial. (N.T. 1.58–1.60).

The court does not condone the effective destruction of the array of photographs from which the defendants may have been identified. Butts and Edwards were first described by Lee perhaps as late as April 11, 1980 (Ex. GS-1, N.T. 1.72), fifteen days after last contact with them. That initial description omitted to note that Edwards wore a hat although Lee testified at trial that Edwards delivered heroin packets in his hat. (N.T. 3.70, 3.110). Lee stated he knew Edwards' name in March, 1980 (N.T.

---

**2.** In *United States v. Kulp*, 365 F.Supp. 747 (E.D.Pa.1973), *aff'd mem.*, 497 F.2d 921 (3d Cir. 1974), which defendant cites, severance was denied and the court issued similar instructions to the jury. In this case, as in *Kulp*, there was independent evidence from which a jury could find Butts guilty.

3.102), but he referred to the person later identified as "Edwards" by an alias in the investigative reports he submitted in April, 1980. (N.T. 3.103). Between the time of the critical events and the trial, Lee had participated in some twenty-six or twenty-seven other investigations (N.T. 3.63–3.64), so a potential for confusion did exist. Even if these facts go to the weight of Lee's identification testimony and not its admissibility, Lee did impede defense counsel in testing that testimony by either returning the photographs to the file without record or destroying them.

But the Supreme Court has held that the corrupting effect of a suggestive identification is to be weighed against: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior descriptions of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the trial and the confrontation. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) (undercover narcotics agent's view of a single police photograph and subsequent incourt identification of defendant held to comport with due process).

As in *Manson*, we find that various indicators of Lee's ability and reliability ultimately outweigh any corrupting effect of the challenged identification. Lee encountered both defendants face-to-face in daylight for several hours over the course of three days. (N.T. 1.7–1.14). This exceeded the observation time of the undercover agent in *Manson*. Lee examined the police photographs within four days of these encounters. (N.T. 1.30, 1.46). Lee was certain that the photographs were those of the persons with whom he dealt. (N.T. 3.94, 1.31–1.32). Lee was not a lay eyewitness but a veteran of the police department for eleven years, approximately eight of which had been spent as a member of a drug enforcement task force. (N.T. 2.36–2.37). Lee viewed the photographs at his leisure and alone. (N.T. 1.17 *et seq.*). There was little pressure on Lee to "acquiesce in the suggestion that such a display entails." *Manson, supra* at 116, 97 S.Ct. at 2253. Under these circumstances, and despite his very confused testimony about the use of the photographs, Lee's identification testimony was admissible for consideration by the jury.

## C. Jencks Act

This ground for a new trial is raised by Butts. At the time of the alleged offenses, Officer Lee was employed by the Philadelphia Police Department and assigned to the DEA. Lee testified that he made the "undercover" drug deals and Butts and Edwards were the men with whom he dealt. Officer Henry Cunningham ("Cunningham") was a member of the DEA surveillance team which monitored the illicit transactions during the days of March 25, 26, and 27, 1980. Lee prepared two handwritten investigative reports describing the transactions and Cunningham prepared one such report. (Ex. GS–1, 2, 3; N.T. 3.26, 4.4). These reports were prepared sometime after the events of March 25, 26, and 27, 1980 and submitted to a typist on April 11 and 15, 1980. (N.T. 3.29–3.31; 4.10). The officers destroyed their handwritten drafts after comparing them with the typed investigative reports ("DEA–6"). (N.T. 3.34, 4.5). This was their routine practice. (N.T. 3.34, 4.9). The typed reports were then submitted to a supervisor (N.T. 3.30, 4.5) but the supervisor did not (and could not) compare the rough drafts with the typed reports. (N.T. 4.9). The officers testified that their typed reports, which were made available to defense counsel, were identical in content to their handwritten drafts. (N.T. 3.27, 4.5). Lee stated that the only changes he made on the rough draft itself were spelling corrections and the like. (N.T. 3.35). Cunningham did not recall correcting his rough draft. (N.T. 4.16). The supervisor did not testify.

■ The Jencks Act, 18 U.S.C. § 3500,[3] requires the government to produce, on motion of defendant, any statement of a government witness which relates to the subject matter of that witness' testimony. In this Circuit it is clear that a handwritten draft of an investigative report by a DEA agent might be Jencks Act material and should at least be available to the court for inspection. *United States v. Walden*, 578 F.2d 966 (3d Cir. 1978). As a matter of judicial discretion, a rough draft need not be disclosed to the defense if it is substantially identical to the final report. *Walden, supra* at 971.

In *Walden*, rough drafts of DEA investigative reports were available at trial but defendant's motion for production was denied. On remand from the Court of Appeals to determine whether or not the handwritten drafts were statements within the meaning of the Jencks Act, the district court then found that the rough drafts had since been destroyed. The court held the drafts were statements, approved or adopted by the agent and thus subject to the requirements of the Jencks Act, because he knew when he sent them to his supervisor for review that they would thereafter be forwarded to a typist. *United States v. Walden*, 465 F.Supp. 255, 261 (E.D.Pa.1978), aff'd, 590 F.2d 85 (3d Cir.) (per curiam),

cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979). But the agent in *Walden* had the opportunity to make substantive revisions to the *typed* report, *Walden, supra* 578 F.2d at 970, so that his adoption and approval of the rough draft could not have been inferred from the finality of the report in the form sent to his supervisor. *But see United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981) (citing *United States v. Kaiser*, 660 F.2d 724 (9th Cir. 1981)). Rather, the inference of adoption might have been drawn from the fact that the draft report "was at least in a form sufficiently acceptable to the agent that he allowed it to be reviewed by his superior." *Walden, supra* 578 F.2d at 970 (citing *United States v. Carrasco*, 537 F.2d 372 (9th Cir. 1976)). In *Carrasco*, the court held that a government witness' diary turned over to a DEA agent was a Jencks Act "statement" because a statement, unlike a diary remaining in the hands of its author, "seeks to transmit information from declarant to the reader." *Carrasco, supra* at 375.

In this case, Lee and Cunningham gave their drafts to a typist, compared the typed reports with their drafts, signed the typed reports, and then submitted the typed reports to their supervisor. Unlike *Walden*, their supervisor did not receive the rough

---

3. In relevant part, 18 U.S.C. § 3500 provides:
    Demands for production of statements and reports of witnesses
    (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
    (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

\* \* \* \* \* \*

    (d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.
    (e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
    (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
    (2) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; . . .

drafts.[4] However, Lee gave Cunningham the rough draft of Lee's first report. (N.T. 4.12). Of the three reports written by Lee and Cunningham, it was only this first report that completely described Butts and Edwards (Ex. GS–1).[5] Cunningham admitted receiving that report but said that he thought Lee gave it to him to submit to the typist and that he did not read it; this cannot be the whole story. (N.T. 4.13; 3.140–3.141). Cunningham's report was submitted to the typist on April 11, 1980 (Ex. GS–3). That report refers to the descriptions of the defendants in Lee's first report (Ex. GS–1) which was also submitted to the typist on April 11, 1980. As Cunningham testified that his own handwritten and typed reports were identical in content, he must have read Lee's handwritten report because it was specifically incorporated in his own report. Lee failed to state why he gave his report to Cunningham. However, given their close and friendly relationship to which Lee did testify, it is permissible to infer and we find that Lee's handwritten draft of his April 11, 1980 report (Ex. GS–1) was at least in a form sufficiently acceptable to him that he allowed it to be reviewed by his surveillance team member who subsequently incorporated it by reference in his own report about the same events. It follows that this draft was adopted or approved by Lee and was a statement within the meaning of the Jencks Act. Indeed, the government "does not dispute" that all of the drafts were "statements" within the meaning of the Jencks Act.

Therefore, the issue is whether the destruction of this undisputed Jencks material constitutes mere harmless error. Butts contends that the officers' destruction of those rough drafts impaired his defense because he was deprived of potential impeachment material in a case where the testimony of Lee was critical. Pursuant to the statute, which provides for striking that witness' testimony or declaring a mistrial as a sanction for non-production, 18 U.S.C. § 3500(d), Butts moves for a new trial.

■ These sanctions are not mandatory. Courts of this Circuit have held Jencks Act violations to be harmless error in some circumstances. *See, United States v. Walden,* 465 F.Supp. 255 (E.D.Pa.1978), *aff'd,* 590 F.2d 85 (3d Cir.) (per curiam), *cert. denied,* 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979); *United States v. Vella,* 562 F.2d 275 (3d Cir. 1977) (*per curiam* ), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978); *United States v. Niederberger,* 580 F.2d 63 (3d Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); *United States v. Harris,* 560 F.2d 148 (3d Cir. 1977), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1978); *United States v. Deerfield Specialty Papers, Inc.,* 501 F.Supp. 796, 800 n.2 (E.D.Pa.1980); and *United States v. Heard,* 439 F.Supp. 172 (E.D.Pa.1977). However, we are mindful that the standard of post trial review set out by the Supreme Court in *United States v. Goldberg,* 425 U.S. 94, 111 n.21, 96 S.Ct. 1338, 1348 n.21, 47 L.Ed.2d 603 (1976), is that "the harmless error doctrine must be strictly applied in Jencks Act cases."

In *Walden,* the district court held that despite the destruction of the rough drafts, non-production was harmless for three reasons. First, the defendant was provided with typewritten copies of the reports. Second, credible witnesses (the agent who prepared the report and his supervisor) testified that they had examined the rough drafts and the typewritten copies were identical in content to the drafts except for spelling and grammatical changes. Third, the agents' testimony evidenced no bad faith in the destruction of the documents. *Walden, supra,* 465 F.Supp. at 261.

■ This case is disturbing because it involves the destruction of an investigative

---

**4.** This difference in paper flow later becomes crucial in making the harmless error determination, for in *Walden* the interposition of a supervisor between the rough draft and final report made possible credible, independent corroboration of the rough draft's contents. Such is not the case here. *See* p. 613 *infra.*

**5.** Ex. GS–2 and GS–3 incorporate by reference the descriptions contained in GS–1.

report rough draft by a DEA agent [6] in this Circuit *after Walden*.[7] The draft may have been prepared as much as two weeks after the critical events and Lee testified that he wrote the draft from memory. (N.T. 3.36). The officers engaged in a "group discussion of what transpired in the street" with other members of the surveillance team prior to the submission of their reports to the typist. (N.T. 3.37–38, 3.138–3.141). Cunningham had possession of Lee's handwritten report before it was submitted to the typist. (N.T. 4.12). In these circumstances, we cannot place faith in the accuracy of Lee's testimony that his rough draft and final report were identical or that the rough draft was not substantially revised at some point. It is impossible to find harmless error, for the jury's verdict could not be based on testimony tried by effective cross-examination.

The government has failed to demonstrate that no prejudice resulted to the defendants. The safeguards which other courts have cited in denying sanctions for non-production do not exist in this case. Unlike *Walden*, no person other than the one whose testimony would be challenged by use of the Jencks materials testified to the content of the draft. The government submitted no mechanical reproductions. *See, United States v. Meisch*, 370 F.2d 768, 772 (3d Cir. 1966) (carbon copy). There was no independent co-extensive information as to its content. *See, Deerfield, supra* at 800 n.2 (other contemporaneous notes available). Without the testimony of the government's eye witness to the transactions, the government's evidence would have been far weaker. *See, Niederberger, supra* at 71 (ample evidence independent of witness' testimony). Lee's draft contained the only complete descriptions of the drug deal participants, which are not matters of little import. *See, Heard, supra* at 174 (notations of times of little import). Even where Jencks Act statements were made available, the Court of Appeals has upheld a lower court's decision to strike the testimony of the witness because the production was untimely. *United States v. Jackson*, 649 F.2d 967, 971–72 (3d Cir. 1981). Here, there was not an untimely production but no production at all, and there could be none because the draft reports were knowingly destroyed.

In *Walden*, Judge Hannum was influenced by the fact that subsequent to the trial DEA purportedly instituted a policy requiring the retention of drafts. *Walden, supra* 465 F.Supp. at 260. However, at this trial Cunningham testified that it was still routine practice to destroy drafts after the final reports were produced and that it was not office policy to show rough drafts to supervisors. Three years after *Walden*, the government seeks to excuse its agents' conduct by arguing that the DEA retention policy "is at best confusing." (N.T. 3.23).[8]

These conflicting representations to the court resemble those regarding FBI practice recounted in *Vella*, where the court stated:

> To avoid future misunderstandings, we specifically adopt the precepts announced in *United States v. Harrison*, 173 U.S.

---

**6.** Lee and Cunningham were Philadelphia policemen assigned to the DEA Task Force. They testified as government witnesses at trial so the Jencks Act is clearly applicable.

**7.** The Third Circuit decision in *Walden* requiring trial court examination of draft reports to determine if they are "statements" under the Jencks Act, was filed June 15, 1978 (amended August 8, 1978). On remand, Judge Hannum decided the rough drafts were Jencks Act material on November 6, 1978; the determination that their destruction was harmless error in that case was affirmed January 9, 1979. These rough drafts were submitted to the typist on April 11 and 15, 1980 and destroyed sometime thereafter.

**8.** The parties submitted to the court DEA Legal Comment No. 22 entitled "Retention of Original Investigative and Interrogation Notes," dated October 1, 1979, in which the Office of Chief Counsel fails to cite the *Walden* case which was decided nine months earlier. The Counsel does conclude, at page 9, that rough draft investigative reports should be retained.

There is no suggestion that the United States Attorney acted improperly. But there was a failure to inform the local investigative agencies of the relevant court decisions in this Circuit and the need to comply with them.

App.D.C. 260, 524 F.2d 421 (1975), as the law in this circuit, to-wit, the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the appellant under the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or the Jencks Act.

*United States v. Vella, supra,* 562 F.2d at 276. We see no reason why DEA agents are to be distinguished from those of the FBI regarding *Brady* material or the Jencks Act. We cannot presume on this record that the DEA acts in good faith in view of the continued failure of DEA agents to retain rough drafts of their investigative reports. Efforts before this court to justify non-production of Jencks Act "statements" in terms of DEA policy or practice can no longer be tolerated. A "useful deterrent purpose would be served by penalizing the government" here and now. *United States v. Paoli,* 603 F.2d 1029, 1037 (2d Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979).

The court is mindful of the fundamental importance of the work of the Drug Enforcement Administration. However, the protection of the Jencks Act goes to the heart of the fact finding process. That protection would be gutted if, on these facts, no sanctions were imposed. The failure of the DEA to heed the Jencks Act as construed in courts of this Circuit leaves this court no alternative.

A decision in this matter was deferred until trial transcripts were available because of the exceptional length of the jury deliberation and these troublesome legal issues. We hold that it was error to fail to strike the testimony of Officer Lee in light of his destruction of a rough draft investigative report and the absence of any independent corroboration of what that draft contained. A new trial for both defendants will be ordered.[9]

9. Only counsel for Butts raised the Jencks Act as a ground for a new trial in their post trial motions. Since the statement which was destroyed referred to both defendants, a new trial is granted as to each defendant.